WISCONSIN'S ENVIRONMENTAL DECADE, INC., and Public
Intervenor Kathleen M. Falk,
Petitioners-Appellants,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES,
Respondent,

GENERAL GROWTH DEVELOPMENT CORPORATION and
Town of Grand Chute,
Intervenors-Respondents.
[Case No. 83–360.]

CITY OF APPLETON, a municipal corporation,
Petitioner-Appellant,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES,
Respondent.

LEAGUE OF WOMEN VOTERS OF APPLETON, INC.; Save
Downtown Committee, Inc.; David Prosser, Jr.;
Michael P. Haley and Frank Hardt, Petitioners-
Appellants,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES,
Respondent.

LEAGUE OF WOMEN VOTERS OF APPLETON, INC.; Save
Downtown Committee, Inc.; David Prosser, Jr.;
Michael P. Haley and Elizabeth L. Hoover, Petition-
ers-Appellants,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES,
Respondent.

LEAGUE OF WOMEN VOTERS OF APPLETON, INC.; Save Downtown Committee, Inc.; Aid Association for Lutherans, Inc.; Richard Warch; David Prosser, Jr.; Frank Hardt; Michael Haley; Ronald Metty; David N. Innis; John Conway; Kathleen M. DeFurio; John Disher; Willis H. Barb; Sharron Huss; Howard Gilbertson; Kay Sosnowski; Lawrence P. Hauser; Ray Gevelinger; John Zimmerman; David N. Weiland; Wisconsin's Environmental Decade, Inc., Petitioners-Appellants,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent.

SAVE DOWNTOWN COMMITTEE, INC.; Aid Association for Lutherans, Inc.; Richard Warch; David Prosser, Jr.; Frank Hardt; Michael Haley; Ronald Metty; Paul and Mary Guyette; David N. Innis; John Conway; Kathleen M. DeFurio; John Disher; Willis H. Barb; Sharron Huss; Howard Gilbertson; John Gilmour; Kay Sosnowski; Lawrence P. Hauser; Ray Gevelinger; John Zimmerman; David N. Weiland; John Farrell; and Wisconsin Public Intervenor Kathleen M. Falk, Petitioners-Appellants,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent.

Kathleen M. FALK, Wisconsin Public Intervenor, Petitioner-Appellant,

v.

State of Wisconsin DEPARTMENT OF NATURAL RESOURCES,
Respondent.
[Case No. 83–468.]

Supreme Court

*Nos. 83–360, 83–468. Argued October 4, 1983.—
Decided November 30, 1983.*

(Also reported in 340 N.W.2d 722.)

For the petitioner-appellant, City of Appleton, there were briefs by *Susan Steingass* and *Stafford, Rosenbaum, Rieser & Hansen,* Madison, and oral argument by *Ms. Steingass.*

For other petitioners-appellants there were briefs by *Peter A. Peshek, Kathleen M. Falk, Thomas J. Dawson* and *Frank Jablonsky,* all of Madison, *David Prosser,* Appleton, and *Donald Zuidmulder* and *Cohen, Grant, Zuidmulder & Gazeley, Ltd.,* Green Bay, and oral argument by *Ms. Falk.*

For the respondent, Wisconsin Department of Natural Resources, the cause was argued by *Steven B. Wickland,* assistant attorney general, with *Bronson C. La Follette,* attorney general, on the brief.

For the intervenor-respondent, General Growth Development Corporation, there were briefs by *Charles Q. Kamps, Stuart Parsons, Arthur A. Vogel, Jr.,* and *Quarles & Brady,* and oral argument by *Mr. Kamps,* all of Milwaukee.

For the intervenor-respondent, Town of Grand Chute, there were briefs by *Kevin Lonergan* and *Herrling, Clark, Hartzheim & Siddall, Ltd.,* Appleton, and oral argument by *Don R. Herrling,* Appleton.

Amicus curiae brief was filed by *Brady C. Williamson* and *La Follette, Sinykin, Anderson & Munson,* Madison, for Representative Thomas A. Loftus, Speaker of the Wisconsin State Assembly; Senator Fred Risser, President of the Wisconsin State Senate; Representative Jeffrey A. Neubauer, Chairman of the Assembly Environmental Resources Committee; Senator Joseph A. Strohl, Chairman of the Senate Energy and Environmental Resources Committee; and Senator Mordecai Lee, Chairman of the Urban Affairs and Government Operations Committee.

STEINMETZ, J. These cases do not involve the wisdom of locating the shopping mall near the Town of Grand Chute, Outagamie county, next to Highway 41, west of Appleton. That decision was resolved by local representatives composing the zoning committee, a committee of the Outagamie county board, after a public hearing pursuant to sec. 16.65 of the Outagamie County Ordinances, the "Outagamie County Shoreland Protection Ordinance," which approved the issuance of conditional use permits to the developer, General Growth Development Corporation (General Growth) in April, 1981. In *League of Women Voters v. Outagamie County,* 113 Wis. 2d 313, 334 N.W.2d 887 (1983), the league petitioned this court to review the court of appeals decision which denied the league a contested case hearing before the zoning committee. We affirmed the court of appeals and held at 113 Wis. 2d 326: "In either case, they were not entitled to invoke the contested case procedures provided by sec. 68.11."[1]

[1] Sec. 68.11, Stats., provides:

"Sec. 68.11 **Hearing on administrative appeal.** (1) TIME OF HEARING. The municipality shall provide the appellant a hearing on an appeal under s. 68.10 within 15 days of receipt of the notice of appeal filed or mailed under s. 68.10 and shall serve the appellant with notice of such hearing by mail or personal service at least 10 days before such hearing.

Case No. 83–360 is a review pursuant to a certification from the court of appeals of a judgment of the Dane county circuit court, the Honorable Charles D. Heath, Marinette county circuit court judge, presiding. Judge Heath dismissed a petition for review of the department of natural resources (DNR) order issuing six water-related permits under ch. 30, Stats. The issue in case No. 83–360 is the appropriateness of the DNR's action in issuing water diversion permits without preparing an Environmental Impact Study (EIS) pursuant to sec. 1.11 (1) and (2), Stats.[2]

"(2) CONDUCT OF HEARING. At the hearing, the appellant and the municipal authority may be represented by counsel and may present evidence and call and examine witnesses and cross-examine witnesses of the other party. Such witnesses shall be sworn by the person conducting the hearing. The municipality shall provide an impartial decision maker, who may be an officer, committee, board, commission or the governing body who did not participate in making or reviewing the initial determination, who shall make the decision on administrative appeal. The decision maker may issue subpoenas. The hearing may, however, be conducted by an impartial person, committee, board or commission designated to conduct the hearing and report to the decision maker.

"(3) RECORD OF HEARING. The person conducting the hearing or a person employed for that purpose shall take notes of the testimony and shall mark and preserve all exhibits. The person conducting the hearing may, and upon request of the appellant shall, cause the proceedings to be taken by a stenographer or by a recording device, the expense thereof to be paid by the municipality."

[2] Sec. 1.11, Stats., provides:

"1.11 Governmental consideration of environmental impact. The legislature authorizes and directs that, to the fullest extent possible:

"(1) The policies and regulations shall be interpreted and administered in accordance with the policies set forth in this section and chapter 274, laws of 1971, section 1; and

"(2) Except as provided in s. 145.022, all agencies of the state shall:

"(c) Include in every recommendation or report on proposals for legislation and other major actions significantly affecting

Case No. 83–468 is a review pursuant to a petition to bypass the court of appeals challenging the judgment of

the quality of the human environment, a detailed statement, substantially following the guidelines issued by the United States council on environmental quality under P.L. 91–190, 42 U.S.C. 4331, by the responsible official on:

"1. The environmental impact of the proposed action;

"2. Any adverse environmental effects which cannot be avoided should the proposal be implemented;

"3. Alternatives to the proposed action;

"4. The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

"5. Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

"6. Such statement shall also contain details of the beneficial aspects of the proposed project, both short term and long term, and the economic advantages and disadvantages of the proposal.

"(d) Prior to making any detailed statement, the responsible official shall consult with and obtain the comments of any agency which has jurisdiction or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate agencies, which are authorized to develop and enforce environmental standards shall be made available to the governor, the department of natural resources and to the public. Every proposal other than for legislation shall receive a public hearing before a final decision is made. Holding a public hearing as required by another statute fulfills this section. If no public hearing is otherwise required, the responsible agency shall hold the hearing in the area affected. Notice of the hearing shall be given by publishing a class 1 notice, under ch. 985, at least 15 days prior to the hearing in a newspaper covering the affected area. If the proposal has state-wide significance, notice shall be published in the official state newspaper;

"(e) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unnresolved conflicts concerning alternative uses of available resources;

"(h) Initiate and ultilize ecological information in the planning and development of resource-oriented projects.

"(3) All state agencies shall review their present statutory authority, administrative regulations, and current policies and

the circuit court for Outagamie county, the Honorable Charles D. Heath, presiding, which dismissed a petition for review of the DNR's decision not to require an EIS. Also, in case No. 83–468, review is sought of the DNR's decision to issue an air pollution control permit under ch. 144, Stats., and its orders denying requests for a contested hearing on the no-EIS decision, an air permit grant, the adequacy of the Environmental Impact Assessment Screening Worksheet (EIASW) and the air permit application.

In August, 1979, General Growth, an Iowa corporation, proposed construction of a shopping mall in the Town of Grand Chute. The proposed site is a 114-acre tract of land located three miles west of Appleton. The site is traversed by Mud Creek and its unnamed tributary, both of which are "navigable streams."

This court set out the test for reviewing an administrative agency's determination not to prepare an EIS in *Wis. Environmental Decade v. Pub. Service Comm.*, 79 Wis. 2d 409, 256 N.W.2d 149 (1977). In that case, referred to as *WED III,* the issue was the need for the

procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this section and chapter 274, laws of 1971, section 1 and shall propose to the governor not later than July 1, 1972, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this section and chapter 274, laws of 1971, section 1.

"(4) Nothing in this section affects the specific statutory obligations of any agency:

"(a) To comply with criteria or standards of environmental quality;

"(b) To coordinate or consult with any other state or federal agency; or

"(c) To act, or refrain from acting contingent upon the recommendations or certification of any other state or federal agency.

"(5) The policies and goals set forth in this section are supplementary to those set forth in existing authorizations of agencies."

Public Service Commission (PSC) to prepare an environmental impact statement (pursuant to the Wisconsin Environmental Policy Act (WEPA), ch. 274, Laws of 1971) before making its decision on a rate increase.

In *WED III* this court stated the legislative intent of WEPA as constituting "a clear legislative declaration that protection of the *environment* is among the 'essential considerations of state policy,' and as such, is an essential part of the mandate of every state agency." *Id.* at 416. (Emphasis added.) The scheme of WEPA is not proposed to control agency direction, but to require that agencies consider and evaluate the environmental consequences of alternatives available to them in the exercise of that consideration in the framework provided by sec. 1.11, Stats. *WED III,* 79 Wis. 2d at 416.

*WED III* held that once it was determined that an EIS was required, then:

"The impact statement is to substantially follow the guidelines issued by the United States Council on Environmental Quality under NEPA,[2] and must include considerations of:

" '1. The environmental impact of the proposed action;

" '2. Any adverse environmental effects which cannot be avoided should the proposal be implemented;

" '3. Alternatives to the proposed action;

" '4. The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

" '5. Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

" '6. Such statement shall also contain details of the beneficial aspects of the proposed project, both short term and long term, and the economic advantages of the proposal.' " (Footnote 3 omitted.)

---

"2

"Title II of NEPA, 42 USCA sec. 4341, et seq., created the Council on Environmental Quality with broad re-

sponsibility to review and appraise the various programs and activities of the federal government in light of NEPA's policies and goals, and to report to the president thereon. By executive Order 11514, March 5, 1970, 3 CFR 271, 35 Fed. Reg. 4247 (1970), the President directed the council to, among other things, issue guidelines to federal agencies for the preparation of environmental impact statements. The council thereafter published three sets of NEPA guidelines: *CEQ Interim Guidelines,* May 11, 1970, 35 Fed. Reg. 7390 (1970); *CEQ Guidelines,* April 23, 1971, 36 Fed. Reg. 7724 (1971), superseding the interim guidelines; and *CEQ Guidelines,* August 1, 1973, 40 CFR sec. 1500.1, et seq., which superseded the April 23, 1971 guidelines.

"WEPA did not establish any parallel to the Council on Environmental Quality created by NEPA. However, the Governor of Wisconsin has, by executive order, promulgated *two sets of guidelines,* based upon proposals of the Interagency WEPA Coordinating Committee, and has directed compliance therewith by all state agencies listed in ch. 15, Stats., including attached boards and commissions. *Guidelines for the Implementation of the Wisconsin Environmental Policy Act,* issued by Executive Order No. 69, of December 5, 1973; *Revised Guidelines for the Implementation of the Wisconsin Environmental Policy Act,* issued by Executive Order No. 26, of February 12, 1976." *Id.* at 416–17. (Emphasis added.)

*WED III* recognized the legislative directive that the state agency conduct an investigation to determine the threshold question of whether an EIS should be prepared. *WED III* discussed the need for a proper threshold decision by a state agency determining the need for an EIS when stating:

"It is obvious that achievement of WEPA's goals will be significantly compromised if ill-advised determinations not to prepare an EIS are permitted by the courts to stand. Thus a consideration of the manner in which WEPA was intended to function dictates a liberal approach to the threshold decision of whether the impact statement should be prepared." *Id.* at 419.

*WED III* established the standard for court review of the agency's decision not to prepare an EIS as "whether the decision not to prepare an EIS was reasonable under the circumstances." *Id.* at 421. The exact language adopting the standard was: "We are of the opinion that the test of *reasonableness* should be applied to review a negative threshold decision under WEPA." *Id.* at 423. (Emphasis added.) The court suggested "there may be cases under WEPA when some degree of deference to agency expertise is appropriate—provided the agency is shown to possess such expertise and to have applied it in good faith." *Id.* at 423. The inference of the court is, therefore, that since the DNR is the state agency with staff, sources and expertise in environmental matters, the test is merely one of a "good faith" decision required of the DNR.

The questions by which the PSC was tested in *WED III* and the two-tier test set for future cases was set forth at 79 Wis. 2d 425:

"First, has the agency developed a reviewable record[15] reflecting a preliminary factual investigation covering the relevant areas of *environmental* concern in sufficient depth to permit a reasonably informed preliminary judgment of the *environmental* consequences of the action proposed; second, giving due regard to the agency's expertise where it appears actually to have been applied, does the agency's determination that the action is not a major action significantly affecting the quality of the *human environment* follow from the results of the agency's investigation in a manner consistent with the exercise of reasonable judgment by an agency committed to compliance with WEPA's obligations?" (Emphasis added.)

---

"[15]

"The record for this purpose need not follow any particular form. *See Hanly v. Kleindienst,* 471 F.2d 813, 835 (2d Cir. 1972), *cert. denied* 412 U.S. 908. However, it must reveal in a form susceptible of meaningful evalua-

tion by a court the nature and results of the agency's investigation and the reasoning and basis of its conclusion."

*WED III* also held that:

"Both the *Guidelines for the Implementation of WEPA*[16] and the *CEQ Guidelines* prepared for federal agencies under NEPA[17] indicate that both direct and indirect effects must be considered. WEPA was intended to require cognizance of environmental consequences 'to the fullest extent possible.' "

"16

"Sec. 1.4.D of the Revised Guidelines for the Implementation of WEPA (note 2, *supra*) includes in the definition of 'action' the 'review and authorization of environmentally significant public and private actions,' and states as an example of this category of action the setting of public utility rates. As to the types of effects of an action which must be considered in assessing its environmental significance, Sec. I.5. provides in part:

" 'B. Stimulation of secondary effects. Even if the action itself has minimal or no direct environmental effects, if its nature is to stimulate or induce significant, secondary effects—such as major new developments encouraged by new highways or sewer extensions—the need for an impact statement is increased. Secondary effects may often be even more substantial than the primary effects of the original action. . . .

" ' . . .

" 'E. Cumulative impacts. Many state agencies' actions regarding a project or complex of projects can be individually limited but cumulatively considerable. When an action forms a precedent for future individual actions or represents a decision in principle about a future major course of action, the cumulative effects of future actions should be considered when determining if an impact statement is required.' "

"17

"CEQ Guidelines, note 2, *supra,* 40 CFT sec. 1500.6, provides in part:

" 'Sec. 1500.6 Identifying major actions significantly affecting the environment.

" '(a) The statutory clause "major Federal actions significantly affecting the quality of the human environment" is to be construed by agencies with a view to the overall, cumulative impact of the action proposed, related Federal actions and projects in the area, and further actions contemplated. Such actions may be localized in their impact, but if there is potential that the *environment* may be significantly affected, the statement is to be prepared. Proposed major actions, the environmental impact of which is likely to be highly controversial, should be covered in all cases. In considering what constitutes major action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable. This can occur when one or more agencies over a period of years puts into a project individually minor but collectively major resources, when one decision involving a limited amount of money is a precedent for action in much larger cases or represents a decision in principle about a future major course of action, or when several Government agencies individually make decisions about partial aspects of a major action. In all such cases, an environmental statement should be prepared if it is reasonable to anticipate a cumulatively significant impact on the environment from Federal action. The Council, on the basis of a written assessment of the impacts involved, is available to assist agencies in determining whether specific actions require impact statements. (Emphasis added.)

" '(b) Section 101(b) of the Act indicates the broad range of aspects of the environment to be surveyed in any assessment of significant effect. The Act also indicates that adverse significant effects include those that degrade the quality of the environment, curtail the range of beneficial uses of the environment, and serve short-term, to the disadvantage of long-term, environmental goals. Significant effects can also include actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial. Significant effects also include secondary effects, as described more fully, for example, in sec. 1500.8 (a) (iii) (B). The significance of a proposed action may

also vary with the setting, with the result that an action that would have little impact in an urban area may be significant in a rural setting or vice versa. While a precise definition of environmental 'significance,' valid in all contexts, is not possible, effects to be considered in assessing significance include, but are not limited to, those outlined in Appendix II of these guidelines.'" *Id.* at 428–30.

While the indirect secondary effects may be influential in an EIS, they are not necessarily controlling in determining the threshold question of whether an EIS is to be prepared. The presence of significant indirect effects or cumulative effects only increase the need for an EIS; their presence alone does not require an EIS. For that interpretation, we go to the very clear language of sec. 1.11(2)(c), Stats.: "Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the human environment, a detailed statement . . . ." Thus, only if it is a major action significantly affecting the quality of the human environment is the EIS to be conducted.

Finally, *WED III* set the course for agency investigations in determining the need for an EIS by requiring that the investigation be factual in nature. "However, neither the nature of the information an agency may consider nor the manner in which it may be gathered are limited to the confines of a formal administrative evidentiary hearing. Nor do we think an evidentiary hearing is required as to the threshold EIS decision." *Id.* at 441. Pursuant to *WED III*, the manner of the proceedings is left to the sound discretion of the agency involved, as long as there is opportunity for public participation (*see* PSC 2.91(2)(e), Wis. Adm. Code) [n. 24 at 471] and there is a reviewable record assembled.

We, therefore, examine the record in these cases to see whether the DNR considered relevant areas of environmental concern and whether the DNR conducted an in-

vestigation which was sufficient to provide a record and basis for the exercise of "reasonably informed preliminary judgment of the environmental consequences of the action proposed" and whether the DNR's judgment was reasonable based on the record. *WED III,* 79 Wis. 2d at 435.

The real issue is whether the DNR has an obligation to do an EIS for a project when investigation, research and public hearing reveal that the project will have minor impacts on the environment, but will have possible socio-economic impacts. We find that the statutory law does not so obligate the DNR or any other state agency. The basic issue is whether the DNR committed a procedural error in not doing an EIS. We find on this record that the DNR did not err procedurally.

The Wisconsin Environmental Policy Act (WEPA) is patterned after the National Environmental Policy Act of 1969 (NEPA), 42 USC sec. 4321, et seq. *WED III,* 79 Wis. 2d at 414. Because of this similarity, we have often relied on federal precedent construing NEPA as persuasive authority in interpreting WEPA. *Wis. Environmental Decade v. Public Service Comm.,* 79 Wis. 2d 161, 174, 255 N.W.2d 917 (1977) *(WED II).* In *Metro. Edison Co. v. People Against Nuclear Energy,* —— U.S. ——, 103 S. Ct. 1556 (1983), the United States Supreme Court quoted sec. 102(C) of NEPA, 42 U.S.C. sec. 4332(C) upon which sec. 1.11(2)(c), Stats., is based and then continued:

"To paraphrase the statutory language in light of the facts of this case, where an agency action significantly affects the quality of the human environment, the agency must evaluate the 'environmental impact' and any unavoidable adverse environmental effects of its proposal. The theme of sec. 102 is sounded by the adjective 'environmental': NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the impact or effect on the environment. If we were to seize

the word 'environmental' out of its context and give it the broadest possible definition, the words 'adverse environmental effects' might embrace virtually any consequence of a governmental action that some one thought 'adverse.' But we think the context of the statute shows that Congress was stalking about the physical environment—the world around us, so to speak. NEPA was designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the *physical environment.*" 103 S. Ct. at 1560. (Emphasis added.)

The significant change in the physical environment is what triggers the need for an EIS and although NEPA states goals in sweeping terms of human health and welfare, these goals are ends that Congress has chosen to pursue by means of protecting the physical environment. *Metro. Edison* at 1560–61. This statement of principle and application is also true for WEPA.

The trial court evaluated the record made by the DNR in these cases as follows:

"In summary, it is clear that WEPA does not require the DNR to consider secondary socio-economic impacts in making its threshold determination not to require an EIS. The DNR, not being required to consider those factors, has met the requirements of *WED III,* supra. First, they have developed an extensive record reflecting a preliminary factual investigation concerning the environment. Second, properly exercising their expertise, they have determined that the affect the proposed mall will have on the environment is minimal and not a major action significantly affecting the environment. There is ample evidence in the record to support that decision."

The DNR established an extensive factual basis for its conclusion and, although it considered social and economic effects, it correctly found that such possible effects did not trigger the requirement for an EIS. In the "Environmental Impact Assessment Screening Worksheet" (EIASW), which consisted of 23 pages and at-

tached sources and documents, at paragraph 2 of the additional factors, the DNR stated:

"Even if one were to accept the seriousness of the economic impact of the mall alleged by mall opponents as fact, such concerns have relatively little to do with the decision to prepare or not to prepare an environmental impact statement in this case. WEPA specifically states that state agencies are to follow guidelines established by the President's Council on Environmental Quality (CEQ) in implementing the provisions of WEPA. In the last revision (November, 1978) to the CEQ Guidelines, the question of the relevance of economic considerations to the EIS decision was addressed. At 40 CFR (Code of Federal Regulations) 1508.14, the CEQ defines 'human environment.' CEQ specifically states that 'Human environment shall be interpreted comprehensively to include natural and physical environment and the relationship of people with that environment.' *The regulation further stresses, '. . . economic or social effects are not intended by themselves to require preparation of an environmental impact statement.'* Because of the relatively minor natural and physical environmental effects anticipated as a result of the mall, economic or social effects have little weight in the Department's determination on the need for an EIS." (Emphasis added.)

■

The EIASW prepared by the DNR, which formed the basis for the final decision of March 9, 1982, not to do an EIS, came 19 months after extensive testimony at a January 20, 1982, public hearing, after contact with 80 people outside of the DNR who contributed information, data or opinions on the impact of the mall project, and after review of nearly 30 research sources, including various studies on the economic and social as well as the environmental impacts of the proposed mall on both Appleton and on the Town of Grand Chute. The DNR investigation in this matter was extensive and reflects consideration of direct and indirect environmental effects, and supports the DNR's conclusion that the antici-

pated *physical* and *biological* environmental effects of the mall, including air and water quality impacts, would be minor. Both in terms of obtaining an adequate factual basis and reaching a reasonable conclusion from these facts, the department of natural resources has met the burden of sec. 1.11, Stats., and the standards set out by this court in *WED III* for a threshold EIS decision.

It might be asked as to why not do an EIS rather than 19 months of consideration to decide whether to conduct an EIS. The answer is that sec. 1.11, Stats., is the law and must be followed; an EIS threshold requirement cannot be decided on the basis of political pressure nor on its high public interest. The DNR has been recognized by this court as having special expertise in environmental matters and as we said in *Sanitary Transfer & Landfill, Inc. v. DNR,* 85 Wis. 2d 1, 13, 270 N.W.2d 144 (1978): "Furthermore, it must be remembered that the DNR has been asked to oversee and to safeguard Wisconsin's water quality not only for today's generation but also for tomorrow's. The agency cannot afford to be shortsighted."

The DNR's decision that the action is not a major action significantly affecting the quality of the human environment follows from the results of the agency's investigation in a manner consistent with the exercise of reasonable judgment. The test of *WED III* is not only met but is satisfied beyond any doubt regarding the human physical environment. Certainly, the DNR has shown good faith in its investigation, completion of a record and its reasoned judgment which meets the other suggested lesser test standard of *WED III*.

A review of the record, which is over four feet in height, shows that Outagamie county itself has issued conditional use permits for the project under its ordinances. The water quality of Mud Creek is presently of poor quality, as substantiated by the DNR. The DNR

confirmed the accuracy of the consultant's water quality index values for the stream. The staff added that although the index value indicated poor water quality, that quality is more the result of the naturally degraded conditions of the stream (*i.e.*, low dissolved oxygen levels and widely fluctuating temperature levels due to a lack of spring flow and the slow moving nature of the stream) than of human influence. This is consistent with an analysis of Mud Creek done by the United States Army Corps of Engineers which was consulted by the DNR. As a source consulted, the corps of engineers prepared a memo for recording, written by corps' ecologist, Don M. Kohler. Kohler concluded that "The Mud Creek site possesses no special values, nor does it perform any special functions; and no substantive concerns of the aquatic environment have been identified."[3]

[3] The United States Army Corps of Engineers memo states in relevant part:

"6. *Important Considerations*—When considering a waterbody for discretionary authority, it is necessary to show that the waterbody has values not normally associated with a nationwide-permitted water or that the waterbody provides important functions which exceed those normally associated with a nationwide-permitted waterbody. This section lists important factors which are considered when evaluating an area for the purpose of taking discretionary authority, and assesses the subject waterbody under each factor.

"a. *Threatened or Endangered Species.*—No Federally threatened or endangered species or their critical habitat are known to exist in the project area, nor are any listed for Outagamie County, Wisconsin.

"b. *Rare, Restricted, Endemic or Relict Flora or Fauna*—No rare, restricted, endemic or relict flora or fauna have been reported in or are known to exist in the project area.

"c. *Flora of Unusually High Visual Quality and Infrequent Occurrences*—No flora of unusually high visual quality and infrequent occurrence were found at the project site.

"d. *Flora or Fauna At, or Very Near, the Limits of Their Range*—No flora or fauna at, or near, the limits of their range were found at or reported in the project area.

The EIASW stated there would be a loss of vegetation and animal species resulting from the construction of the

"e. *The Juxtaposition, in Sequence, of Several Seral Stages of Hydrarch Succession*—The project area did not contain several seral stages of hydrarch succession nor are such seral stages normally associated with this type of waterbody.

"f. *High Production of Native Waterfowl Species*—The project site is not a high production area for native waterfowl species.

"g. *Use of Great Numbers of Migrating Waterfowl, Shorebirds, Marsh Birds and Wading Birds*—The project area is not suited for use by great numbers of migratory waterfowl, shorebirds, marsh birds, or wading birds.

"h. *The Presence of Outstanding or Uncommon Geomorphological Features In, or Associated With, the Waterbody*—The project site is a disturbed area with no outstanding geomorphological features.

"i. *The Availability of Reliable Scientific Information Concerning the Geological, Biological or Archaeological History of the Waterbody*—The project area has no special scientific value.

"j. *Waterbodies That Are Relatively Scarce in a Given Physio-Region or That Provide Distinct Visual Contrast*—The type of waterbody at the project site is not scarce in the region nor does it provide any distinct visual contrast.

"k. *Waterbodies That Are Integral Links in a System of Waterways*—Mud Creek is not an integral link in a system of waterways.

"7. *General 40 CFR Factors Deemed Relevant to Nationwide Permit Waters When Considering Discretionary Authority*—

"a. The discharge activities would not significantly disrupt the chemical, physical and biological integrity of the aquatic ecosystem.

". . . .

"c. The discharge activity would not significantly inhibit the movement of fauna into and out of feeding, spawning, breeding, and nursery areas.

"d. The discharge activity would not destroy a wetland area having significant functions in maintenance of water quality.

". . . .

"8. *Conclusions and Recommendation*—Discretionary authority should be reserved for water bodies on the upper end of the value/function scale and not [be] utilized for waterbodies on the low end of this scale simply because of local political issues

mall; the nature of that loss and the setting in which it would occur was the point which required analysis in terms of the environment and a decision on whether to do an EIS. The screening worksheet, at page 5, described the setting:

"The site is located about 1½ miles west of the Appleton (1980 census population 59,032) city limits in the partly rural partly suburban town of Grand Chute (1980 population 9,466). Only small portions of the site are, or were very recently, in active use. Two abandoned structures and one occupied structure are located on the northern edge of the site along Highway 10. The structures are, from east to west: a large abandoned frame and concrete barn at the northeast corner of the site, a parking lot and tavern, and the levelled remains of a motel and parking lot.
"The southwest corner of the site (about 20 acres) is currently used for agriculture. . . .
"The remainder of the site is undeveloped and, for the most part, unused except for activities such as occasional trail motorcycling."

In discussing the biological environment, the EIASW noted at page 4 that as to *flora:*

"This vegetation type is indicative of disturbance conditions (such as those caused by past farming activities and soil moving activities) [during construction of Highway 41] and is found commonly throughout the state.
" . . .
"No state or federally listed endangered or threatened species have been found on the site (General Growth EIR and DNR staff)."

The fact that there were no endangered or threatened species of fauna on site was also noted. The EIASW also

primarily or totally non-aquatic environment oriented. The Mud Creek site possesses no special values, nor does it perform any special functions; and no substantive concerns of the aquatic environment have been identified. Therefore, it is recommended that discretionary authority not be exercised over this portion of Mud Creek in Grand Chute, Outagamie County, Wisconsin."

explained that the wastewater generated by the mall would not only be small in terms of volume and pollutants, but could be adequately treated:

"The mall would discharge approximately 60,000 gallons/day of sanitary wastewater. If the mall were operating today, this waste would go to the Butte des Morts sewage treatment facility. This facility is presently overloaded, but a new regional treatment facility capable of handling projected regional wastewater flows is scheduled for completion by July 1, 1983. If this facility is completed on time, the mall's wastewater would go to this new facility, not the Butte des Morts facility, given the approximate two year construction period for Phase 1 of the mall. In any case, the wastewater flow from the mall would be small enough and low enough in BOD and suspended solids that it would not substantially affect even the existing facility's ability to treat wastes." EIASW at 9.

As to solid waste the EIASW provided:

"Solid waste from the mall would consist of about 480 cubic yards of compacted paper and food wastes per month when the third phase of the mall was completed. This volume would increase slightly when the outparcels were subsequently developed. Solid wastes would be sent to the Outagamie County landfill. There would be no toxic or hazardous wastes associated with this project. Neither the volume nor character of the solid waste from this project would be expected to cause serious environmental problems (letter, Dave Misterek of DNR to Bob Orth of Rice and Orth, September, 1980)." EIASW at 10.

A review of the DNR record referenced in the EIASW not only points out the potential losses, but also the nature and extent of those losses. A review of the record shows that the decision that those losses are of a minor nature and that additional pollutants are of a minor volume and concentration and will be adequately treated reflects "reasonable judgment." *WED III,* 79 Wis. 2d at 425.

As to the air quality not requiring an EIS, the DNR found that in the four-stage planned development of the mall the eight-hour national ambient of air quality was not exceeded even in the "worst case estimate." The secondary effect found was that some future development (if it involved carbon monoxide emissions) could be limited if the mall is completely built within approximately 14 years after first construction. This finding was made after considering a 123-page study of the air quality effects.

In an introductory paper to the EIASW, the DNR stated in relevant part:

"The anticipated physical and biological environmental effects of the mall, including air and water quality impacts, would be minor.

"The Wisconsin Environmental Policy Act (WEPA) is intended to address proposals that affect the quality of the human environment. WEPA is not intended primarily to address local economic issues. Furthermore, Federal regulations which Wisconsin law requires state agencies to follow specifically state that 'economic or social effects are not intended by themselves to require preparation of an environmental impact statement.'

"The department made the final determination that no EIS is required for the proposed project after considering these conclusions in light of the public comments received on the Department's preliminary determination."

The federal regulations referred to are those to be followed pursuant to sec. 1.11 (2) (c), Stats., which provides that state agencies shall follow guidelines issued by the United States Council on Environmental Quality (CEQ) in administering WEPA. The most recent CEQ guidelines, published in November, 1978, provide that the "human environment" includes the *natural* and *physical* environment and, further, that "economic or social effects are not intended by themselves to require preparation of an environmental impact statement." 40 CFR sec. 1508.4. (Emphasis added.)

The socioeconomic injuries alleged by the parties seeking an EIS do not have a direct causal relationship to the minor changes to the physical environment found by the DNR and the alleged socioeconomic injuries do not trigger the requirement that DNR prepare an EIS. *See Metro. Edison,* 103 S. Ct. 1556, and *also, Fox v. DHSS,* 112 Wis. 2d 514, 334 N.W.2d 532 (1983). As held in *Metro. Edison,* it is the *physical* environment that the agency must study for significant effect in the threshold decision to conduct an EIS; that was done by the DNR in this case and then based on the record before it, the DNR exercised reasonable judgment not to prepare an EIS.

The finding that an EIS was not required to be prepared on the air permit and on the water-related permits was made by the DNR on the proper basis that the permits associated with the project do not relate to actions which constitute, in the language of sec. 1.11, Stats., "a major action significantly affecting the human environment."

On January 20–21, 1982, the DNR held a public hearing on this matter. At issue is whether that hearing should have been a contested case hearing. The DNR, in applying the language of sec. 227.064, Stats.,[4] as inter-

---

[4] Sec. 227.064, Stats., provides:

"227.064 **Right to hearing.** (1) In addition to any other right provided by law, any person filing a written request with an agency for hearing shall have the right to a hearing which shall be treated as a contested case if:

"(a) A substantial interest of the person is injured in fact or threatened with injury by agency action or inaction;

"(b) There is no evidence of legislative intent that the interest is not to be protected;

"(c) The injury to the person requesting a hearing is different in kind or degree from injury to the general public caused by the agency action or inaction; and

"(d) There is a dispute of material fact.

preted in *Town of Two Rivers v. DNR*, 105 Wis. 2d 721, 315 N.W.2d 378 (Ct. App. 1981), determined that a contested case hearing was not required. At that public hearing, the DNR accepted written comments on the proposed air pollution control permit and on its preliminary determination not to prepare an EIS.

The DNR argues that since it has discretion to determine whether there is a significant public interest, the petitioners have no right to a hearing and therefore, under sec. 227.064, Stats., they are not entitled to a contested case hearing. This was determined by the court of appeals in *Town of Two Rivers*, 105 Wis. 2d 721, where that court held that sec. 227.064 applies *only when* the petitioner has expressly been given a previous right to a hearing. The court of appeals limited its interpretation of the phrase "any other right provided by law". of sec. 227.064(1) as meaning a statutory right. In *Town of Two Rivers* at 729, the court stated: "The first clause of sec. 227.064(1), Stats., establishes a prerequisite. At the outset, citizens must first previously have been accorded at least some 'right' to a hearing elsewhere in the

"(2) Any denial of a request for a hearing shall be in writing, shall state the reasons for denial, and is an order reviewable under this chapter. If the agency does not enter an order disposing of the request for hearing within 20 days from the date of filing, the request shall be deemed denied as of the end of the 20-day period.

"(3) This section does not apply to rule-making proceedings or rehearings, or to actions where hearings at the discretion of the agency are expressly authorized by law.

"(4) This section does not apply if a hearing on the matter was conducted as a part of a hearing under s. 144.836.

"(5) Except as provided under s. 144.44(2)(m), this section does not apply to any part of the process for approving a feasibility report, plan of operation or license under s. 144.44 or 144.64, any decision by the department of natural resources relating to the environmental impact of a proposed action under ss. 144.43 to 144.47 or 144.60 to 144.74, or any part of the process of negotiation and arbitration under s. 144.445."

statutes." This court of appeals narrow reading of sec. 227.064(1) does not recognize our decision in *Nick v. State Highway Comm.*, 21 Wis. 2d 489, 124 N.W.2d 574 (1963) where we held the term "hearing required by law" presupposes either a hearing expressly provided by statute or administrative rule, or a hearing required by due process. We do not at this time reverse *Town of Two Rivers,* since these petitioners were not entitled to a contested hearing for other reasons.

By its February 9, 1982, denial of the request for a contested case hearing regarding the air permit, the DNR informed the petitioners that their petition was improperly filed under sec. 227.064, Stats., since sec. 144.-403, which incorporates the standing requirement of sec. 227.064(1) for certain hearing requests, is the *sole* basis for requesting a contested case hearing on the DNR activities under sec. 144.391 to 144.402. Additionally, the DNR advised the petitioners that they were not entitled to a contested case hearing since the DNR's determination to issue the permit was only preliminary; it was not a final appealable decision. With respect to sec. 227.064 (1), which sets forth criteria for standing and is incorporated into sec. 144.403(2), the DNR stated that the petitioners lacked standing, since they failed to cite any other statutory provision which accorded them a right to a hearing in the first instance; they failed to identify any injury to a substantial interest; and they failed to allege that they had an injury different in kind and in degree from injury to the general public.

■

The petitioners interpret sec. 227.064(1), Stats., as granting them the right to a contested case hearing regarding the DNR's decision not to prepare an EIS. They are in error.

Under sec. 227.064(1)(c), Stats., petitioners must have an injury different in kind or degree from injury to the general public. The petitioners do not identify an in-

jury "different in kind or degree" from injury to the general public for standing under sec. 227.064. In fact, their position is that they are protecting the general public in addition to themselves.

Petitioner, the Wisconsin Public Intervenor, represents the public rights alone (sec. 165.07, Stats.) and therefore cannot participate in a sec. 227.064 proceeding because such proceedings only create procedural rights to protect individual interests or private injuries under sec. 227.064 (1) (c).

In addition, sec. 227.064 (3), Stats., states: "This section does not apply to rule-making proceedings or rehearings, or to actions where hearings at the discretion of the agency are expressly authorized by law." The hearings on the air permit application and whether an EIS should be prepared are authorized by law to be at the discretion of the agency. We held this in *WED III*, 79 Wis. 2d at 441, by stating: "[N]either the nature of the information an agency may consider nor the manner in which it may be gathered are limited to the confines of a formal administrative evidentiary hearing. Nor do we think an evidentiary hearing is required as to the threshold EIS decision." Continuing at 442, we stated: "However, we are of the opinion that the precise manner in which proceedings are conducted and a reviewable record assembled is a matter for the sound discretion of the agency involved." This court in *WED III* held as a matter of law that the form of hearing to be conducted was at the discretion of the agency involved as long as there was public participation, as there was in this case. The legislature sought to avoid duplicative hearings and since "the hearings at the discretion of the agency are expressly authorized by law," (*WED III* at 441) sec. 227.064, Stats., did not give petitioners the right to a contested hearing as to the EIS decision.

In addition, the petitioners allege the right to a contested hearing in the decision by the DNR in the con-

sideration of the air permit application. For the latter, reliance is placed on sec. 227.064, Stats. That section is available only if the person seeking the contested hearing meets the requirements of sec. 227.064(1), and we have set forth previously that the petitioners do not qualify under that section.

Sec. 144.392, Stats., does not provide for contested hearings but only public hearings. Specifically, sec. 144.-392(7)(b) provides that the hearings are not to be contested case hearings. That section applies to preliminary air permit grants.

Sec. 144.403, Stats., allows for review of a permit issued pursuant to secs. 144.391 to 144.403 and sec. 144.-403(1)(b) provides for a contested case hearing. However, under sec. 144.403(2) a person other than a permit holder is entitled to review only if the person meets the requirements of sec. 227.064(1). These parties did not meet those requirements.

With respect to the issuance of the water permits, on May 14, 1982, the DNR examiner conducting the water diversion permits hearing issued an order limiting the issues that would be considered at the hearing on the ch. 30, Stats., permits. The examiner's decision disallowed any evidence concerning:

(1) Off-site indirect air, water, land, energy and socioeconomic impacts;

(2) Alternatives to the proposed mall;

(3) The energy implications of the proposed mall; and

(4) The off-site indirect air, water, land, energy and socioeconomic impacts.

On July 26, 1982, three days prior to the evidentiary hearings, then-Governor Lee Sherman Dreyfus issued a formal written policy directive to all state agencies called the "Wisconsin Downtown Conservation Policy." This memorandum directed all state agencies to consider the effects of granting permits for actions including those pending on downtowns. This directive was without

force or any controlling merit since an executive directive cannot change or amend the statutory duties and requirements of state agencies under WEPA pursuant to sec. 1.11, Stats.

On July 26 through August 3, 1982, six days of evidentiary hearings were held on the water permits. The Department of Natural Resources hearing examiner refused to take testimony on the indirect and off-site cumulative environmental and socioeconomic impacts of the project, nor consider these factors in the permit process. Numerous offers of proof about these alleged adverse impacts were made in the record by many citizens, including the Public Intervenor.

By order dated September 15, 1982, the DNR, by its hearing examiner, approved the six ch. 30, Stats., water permits. The "Findings of Fact, Conclusions of Law, Permit and Order" was the final agency order issued. In addition, this final order expressly makes final the DNR's decision not to prepare an EIS for the project. The final agency order culminated the three-year long proceeding and was the final agency approval needed for construction of the mall.

Judge Heath's analysis of the proceedings before the examiner and the propriety of his ultimate granting of the permits bears adoption by this court as an analysis of the record made at the hearing. Judge Heath held in his February 3, 1983, "Decision and Order:"

"This was a contested case hearing. Six days of testimony generated over 1,200 pages of transcript. In addition to Dr. Spooner, [Dr. John A. Spooner in the firm of Spooner, Farlow and Associates] who has a Ph.D. in civil engineering with an emphasis in hydraulics, several other experts testified. Dr. Charles Henry Wahtola, a Ph.D. in fisheries, testified as to the nature of Mud Creek, the impact the project would have on the creek, and recommendations as to the relocation. Mr. Ronald

Kaas, a construction engineer employed by the developer, testified as to the engineering and construction of the project and its relationship to its surroundings. Mr. Thomas Probst, a civil and sanitary engineer, with experience in waste water treatment, testified as to waste treatment of the project. Mr. Lawrence Kriese, employed by the DNR as a conservation warden, testified that the only time he ever observed anyone navigate Mud Creek was when he observed canoeists testing it for navigability in connection with the project. He also testified as to fishing activity (mostly illegal) in the area. Mr. Frank Deringer, a water management investigator with the DNR responsible for investigating Chapter 30 permit requests, also testified as to the physical characteristics of the site and the existence of wildlife. Mr. Mark Williams, a staff engineer in the municipal waste water section of the DNR, testified as to the sewer treatment plans for the area to accommodate the project. In addition several other witnesses testified. All the witnesses were examined by as many as five different attorneys during the course of their respective testimonies.

"In conclusion, a thorough, extensive record was developed which provided the hearing examiner with ample testimony to arrive at the findings and conclusions he did. Therefore, the decision of the DNR is affirmed and the petition for review is hereby dismissed."

The hearing examiner, in deciding to issue the water permits under ch. 30, Stats., had in mind the "public interest" criteria of secs. 30.12 and 30.19 relating to navigable waters. The public trust in navigable waters is not to be expanded and diluted to cover downtown preservation.

The hearing examiner's findings of fact, conclusions of law, permit and order dated September 15, 1982, detail the substantial factual basis preceding issuance of the permits. The following are several appropriate findings of fact and conclusions of law, coming after six days of hearings:

## "FINDING OF FACT

" . . .

"14. The site is zoned for light industrial/commercial development which is compatible with the development of a regional shopping center.

" . . .

"16. Conditional use permits for each of the six projects have been issued by Outagamie County dated April 21, 1981, signed by Frank Charlesworth, Coordinator of Public Services. Subsequent to these approvals some modifications have been made to some of the proposals.

" . . .

"19. MC [Mud Creek] at the project site has little value as a spawning area and extremely limited value as a fishery.

"20. MCT [tributary to Mud Creek], because of its intermittent flow, has no value as a fish spawning area and little value as a fishery.

"21. The project site currently provides a habitat for common farm area wildlife including pheasant, rabbits, waterfowl, squirrels, raccoons and some birds. Deer have been observed on the site but it is not a good deer habitat. Some furbearers such as muskrat and mink also inhabit the site. No endangered species are known to inhabit the project site.

" . . .

"23. MC has been previously rerouted and channelized.

"24. The project site contains 1.7% of the watershed of MC and MCT.

" . . .

"38. Riparian owners will not be adversely affected by the relocations of MC, MCT nor by the project nor will public rights in MC or MCT be injured.

"39. Due to a more consistent stream bed and less obstructing vegetation, MCT will have more potential for navigation after its relocation.

" . . .

"41. Due to a more consistent stream bed, MCT will provide an area more conducive to fish migration after relocation.

"42. The project will not adversely affect MC or MCT as fisheries.

"43. The proposed change of course of the waterways will not adversely affect water quality nor will it increase water pollution in the waterways, nor will it cause environmental pollution as defined in Subsection 144.01(3), Stats., upon compliance with the conditions stated in the permit.

". . . .

"50. The proposed structures will not adversely affect water quality in MC or MTC [sic] nor will they increase pollution in the waterways nor will they cause environmental pollution as defined in sec. 114.01(3), Stats.

". . . .

"60. At present, the water quality of MCT varies from good to poor depending on location. The water quality of MC is fair.

". . . .

"82. The Department of Natural Resources has prepared an Environmental Impact Assessment Screening Work Sheet and has certified the Department's compliance with WEPA, Section 1.11, Stats.

"83. No evidence has been offered of any environmental pollution or injury to riparian owners or to public rights in navigable waters resulting from the requested permits.

### "CONCLUSIONS OF LAW

"1. The Department has jurisdiction under Sections 30.12, 30.19 and 30.195, Stats., in an accordance with the foregoing Findings of Fact, to issue permits as requested by the applicant, subject to appropriate conditions as indicated below.

"2. The issuance of these permits will not (a) be detrimental to the public interest in MC or MCT nor (b) be contrary to the public trust doctrine.

"3. The projects as proposed comply with the requirements of NR 116, Wis. Adm. Code, pertaining to flood flow elevations and NR 320, Wis. Adm. Code, pertaining to the regulation of bridges over navigable waterways.

"4. The projects as proposed comply with the relevant standards of Sections 30.12, 30.19 and 30.195, Stats., as set out in the Findings of Fact above and should therefore be issued."

In its EIASW the DNR recognized the consumption
and irretrievability of energy, electricity, natural gas,
oil and gasoline in the construction and operation of the
project. Petitioners argue that sec. 1.12, Stats.,[5] requires
not only consideration of this energy use but that such
use of energy additionally makes it obligatory for the
DNR to conduct an EIS. Sec. 1.12 merely requires in-
vestigation and consideration of the conservation of en-
ergy resources as an important factor when making any
major decision which would significantly affect energy
use. It is a statement of principle and policy but does
not modify the agency's duty in sec. 1.11(2) to conduct
an EIS only if the action significantly affects the quality
of the human environment. That duty was performed by
the DNR deciding not to conduct an EIS based on its
reasoned decision of the substantial record before it.

The amicus curiae brief and public intervenor decry
that the DNR has not prepared one EIS for a private
sector project in six years for what they conclude were
"major and environmentally significant" projects. We
cannot review the decisions of the DNR that led the writ-
ers to such conclusions, unless review as separately and
individually sought. The laws of Wisconsin provide a
review process through the courts for each administra-
tive decision. The legislature sets the standard of review
by the courts over administrative decisions and those
standards must be applied by the courts.

It is not the courts that decide whether and to what
extent an agency must consider the social and economic
impact, as well as environmental implications, of its per-
mit decisions. That was established as law in secs. 1.11

[5] Sec. 1.12, Stats., provides:

"**1.12 Alleviation of energy shortages.** All agencies of the state
shall, to the fullest extent possible, investigate and consider the
conservation of energy resources as an important factor when
making any major decision which would significantly affect en-
ergy usage."

and 1.12, Stats., by the legislature. Any review of the relative and potentially competing merits of environment and socioeconomic impacts for agency consideration is initially left to the legislature in the laws it adopts. The legislature created WEPA and placed its vitality in the federal act, NEPA's, roots. The legislature must decide initially whether it wants agencies of the state to be making its economic climate decisions under the concomitant review of the environment. Also, it must decide whether it wishes to give state agencies equal authority to its own in deciding social issues of this state for generations to come or whether that body will jealously guard its constitutional power and elective authority to make those decisions. Thus far, in WEPA the legislature has directed the agencies to first look at the physical environmental changes and it is only if the environment is significantly affected that the agency must consider indirect and cumulative effects on the economy and form of society in which we and future generations will live.

DNR's conclusions as to the minor nature of the project's impacts on the natural physical environment are findings of fact within its area of expertise and are supported by substantial evidence in the record. Under Wisconsin and federal case law, in the absence of significant impacts upon the natural environment, socioeconomic impacts do not trigger the EIS requirement. DNR's no-EIS decision, grant of the air permit and water diversion permits are based on a reasoned judgment of a reviewable record reflecting a preliminary judgment of the environmental consequences of the action proposed.

*By the Court.*—The judgments of the circuit courts are affirmed.

WILLIAM A. BABLITCH, J. (dissenting). I dissent. This dissent makes no judgment on the merits of the

proposed mall. Whether it should be built, however, is a decision that should be reached only after an Environmental Impact Statement has been issued. Unfortunately, because of today's opinion, an Environmental Impact Statement will not be required.

The department of natural resources (DNR) has determined an EIS is not necessary. It has concluded that the proposed mall will not cause a primary impact on the physical environment. The role of this court is to examine the record and determine whether the DNR's judgment was reasonable based on that record. The majority opinion concludes that the DNR's judgment was reasonable. I strenuously disagree.

The test to be applied by this court is correctly stated in the majority opinion. First, is there a reviewable record of sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences. I agree that such a record exists; in fact, I shall cite to it later at length to demonstrate how the DNR's decision failed to meet the second test, namely: does their decision follow "in a manner consistent with the exercise of reasonable judgment by an agency committed to compliance with WEPA's obligations". *WED III*, 79 Wis. 2d at 425. In other words, does the agency make a convincing case that the impact is insignificant. *See WED III*, 79 Wis. at 425, n. 7, citing *Maryland Nat. Capital Park & Planning Comm. v. Postal Service*, 487 F.2d 1029, 1040 (D.C. Cir. 1973).

The majority correctly finds that in making its determination, the DNR must review the direct and indirect environmental effects of the project. It is clear that all of the law surrounding WEPA requires that *both* direct and indirect effects on the physical environment must be considered. Under this court's decision in *WED III*, both direct and indirect environmental effects must be considered in an EIS decision: ". . . any construction limit-

ing the act to just direct effects would be contrary to [WEPA's] manifest intent." *WED III,* 79 Wis. 2d at 430, n. 16. Section 1.11(2)(c), Stats., specifically requires Wisconsin agencies to follow NEPA guidelines, which also make clear that indirect environmental effects must be considered:

"Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." NEPA Guidelines, 40 C.F.R. sec. 1508.8(b).

The WEPA Guidelines, relied upon by the majority opinion, also make this clear. *Supra,* p 392.

What are the direct and indirect effects this mall will have on the physical environment? The DNR's Environmental Impact Assessment Screening Worksheet (EIASW), points out the following direct and indirect effects of the mall on the physical environment:

This proposed mall is to be located on a 114 acre tract at the southwest corner of U.S.H. 10–41, three miles west of Appleton. It will include approximately one million square feet of building, and parking for about 5,500 cars. The channels of both Mud Creek and its tributary will be relocated. A 4.2 acre stormwater detention basin will collect runoff from the parking lot and hold it so "some" sediments will settle. The rest of the sediments including oil, grease and other automobile related hydrocarbons, chloride from road salting, and metals such as lead, zinc, and cadmium will be discharged to the original stream bed below the mall site. Four access roads are to be constructed. The mall will consume approximately 60,000 gallons of water per day. It will discharge approximately 60,000 gallons of sanitary waste

water a day. Carbon monoxide from the concentrations of vehicles would be the predominant pollutant, about 1,000 *tons* of CO per year on a worst case estimate. "From the air quality degradation standpoint, it is estimated that in 1992 the mall (plus the background concentration) would use up about 80% of the air quality resource for CO. . . ." EIASW p. 10. Solid waste will approximate 480 cubic yards of compacted paper and food wastes per month. Nearly all terrestrial vegetation would be removed from the site, and the terrestrial animals now using the site could be eliminated and displaced. Aquatic flora and fauna would be destroyed when the two streams are moved, and the increased pollution from parking lot runoff could bring the streams limited aquatic life. Finally, and of great significance, on page 18 of the EIASW, under the title "Evaluation", the DNR lists "other events or actions [which] will happen that may significantly affect the environment" as a result of the mall:

"If the mall were developed as proposed, accelerated development could occur in the vicinity due to the customer drawing power of, and services provided by the mall. Several developers appear to be planning office complexes near the mall site (Outagamie County Planning/Energy and Zoning Administration). Other possible secondary development could include single and multi-family housing, as well as commercial development such as fast food restaurants, gas stations, banks, auto parts stores and similar establishments.

"This secondary development could lead to even greater CO and other emissions associated with increased vehicle traffic. Such development could also lead to increased water pollution in local streams, increased wastewater loading to local sewage treatment facilities and increased solid waste loadings to local landfills. Other associated secondary impacts could include accelerated farmland losses, increased traffic and noise, a change in the overall aesthetic quality of the area, and additional

losses of aquatic and terrestrial wildlife due to habitat degradation of loss."

These are the direct and indirect effects on the physical environment listed in the DNR's own EIASW. Undisputably, these *must* be taken into account by the DNR in making its determination.

The DNR concluded that an EIS was not necessary. It concluded that the mall will not cause a primary impact on the physical environment. The majority opinion finds those conclusions reasonable. I couldn't disagree more. For the DNR to determine that these effects are minor, that these effects do not even reach the status of having a primary impact on the physical environment, and for the majority to agree with the DNR's decision and find it reasonable, is to ignore the obvious.

I would hold that the facts recited above *by themselves* indicate that the proposed mall is a "major action significantly affecting the quality of the human environment" within the meaning of 1.11(2)(c), Stats., and that therefore an EIS must be prepared.

Because I conclude that these facts by themselves require an EIS, I do not reach the question of whether the DNR was required to consider the socioeconomic effects in its decision.

I am authorized to state that CHIEF JUSTICE NATHAN HEFFERNAN and JUSTICE SHIRLEY S. ABRAHAMSON join in this dissent.