TOWN OF CENTERVILLE, Laverne Albrecht, Edith Lutze, Karl S. Klessig, Donald Sixel, Harland Albrecht, and Hilbert Freis, Petitioners-Respondents,

v.

DEPARTMENT OF NATURAL RESOURCES, Respondent-Appellant,

Thomas FREIS, Respondent-Intervenor.

Court of Appeals

*No. 87–0123. Argued September 3, 1987.—Decided November 18, 1987.*

(Also reported in 417 N.W.2d 901.)

On behalf of the respondent-appellant there were briefs by *Donald J. Hanaway,* attorney general and *Steven B. Wickland,* assistant attorney general, oral argument by *Steven B. Wickland.*

On behalf of the citizens petitioners-respondents there was a brief and oral argument by *Raymond M. Roder* of *Whyte & Hirschboeck S.C.* of Madison.

On behalf of petitioner-respondent Town of Centerville, there was a brief and oral argument by *Jerome L. Fox* of *Olson, Winter and Fox* of Two Rivers.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

NETTESHEIM, J. The state of Wisconsin Department of Natural Resources (department) appeals from a circuit court judgment reversing a department determination that an environmental impact statement (EIS) was not necessary relative to Thomas Freis' proposal to locate a landfill site on his property in the town of Centerville, Manitowoc county. The circuit court remanded the matter to the department

for the preparation of an EIS. The department contends that an EIS is not necessary. We conclude that the department failed to develop a reviewable record of sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences of the Freis proposal. We also conclude that the department's determination that Freis' proposal is not a major action affecting the quality of the human environment is not the result of an investigation consistent with the exercise of reasonable judgment committed to compliance with the Wisconsin Environmental Policy Act (WEPA). Therefore, we affirm the judgment.

Freis' plan to put a landfill on his property commenced in December 1982, when he filed a feasibility study with the department. In response, the department prepared an environmental assessment (EA) on the project pursuant to Wis. Adm. Code, ch. **NR 150.**[1] Certain citizens in the area became concerned and requested a contested case hearing pursuant to sec. 144.44(2)(m), Stats. Before the hearing was conducted, Freis withdrew his feasibility report because, among other things, the department indicated that the design was inadequate.

In April 1984, Freis submitted a revised feasibility study to the department. The department then prepared an Environmental Assessment Amendment to the 1983 EA. In February 1985, the department determined that the landfill was not a major action which would significantly affect the quality of the

---

[1]Wisconsin Administrative Code, ch. **NR 150** was rewritten in January of 1987. Throughout this opinion all references to ch. **NR 150** will be to the administrative code as it existed before the revisions.

human environment and therefore concluded that an EIS was not necessary. In June 1985, the department made the "no EIS" decision final. The decision that an EIS is not necessary is called a negative declaration. A group of concerned citizens again sought judicial review of this decision.

The trial court reversed the department's decision and remanded the matter to the department for preparation of an EIS. This appeal followed.

Generally, this court owes no deference to the trial court's decision when the trial court is reviewing an administrative agency's decision. *Kimberly-Clark Corp. v. LIRC*, 138 Wis. 2d 58, 63, 405 N.W.2d 684, 687 (Ct. App. 1987).

To assist in making the decision of whether an EIS is necessary, the department has categorized a variety of actions depending upon their effect on the environment. Type I actions require an EIS while Type II actions require an EA but may also require an EIS. The parties agree that the proposed Freis landfill is a Type II action.

WEPA, patterned after the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, et seq., contains a broad statement of the government's commitment to the protection of the environment. *Wisconsin Envtl. Decade v. PSC*, 79 Wis. 2d 409, 414, 256 N.W.2d 149, 153 (1977) (hereinafter referred to as *WED III*). WEPA constitutes a clear legislative declaration that protection of the environment is among the essential considerations of state policy and, as such, is an essential part of the mandate of every state agency. *Id.* at 416, 256 N.W.2d at 153. A negative determination at the initial stage may eliminate to a

significant degree environmental consideration by the agency and may curtail much of the input, which an EIS is designed to foster, of other governmental agencies and the public in the agency's decision process. *Id.* at 419, 256 N.W.2d at 155. Also, given the manner in which WEPA was intended to function, a liberal approach to the threshold decision of whether an EIS should be prepared is necessary. *Id.*

■

Wisconsin courts have held that an EIS is necessary when the proposed action is a major action significantly affecting the quality of the human environment. *Wisconsin Envtl. Decade v. DNR,* 115 Wis. 2d 381, 394, 340 N.W.2d 722, 729 (1983). *See also* sec. 1.11(2)(c), Stats. By concluding that the Freis landfill was not a "major action" the department essentially decided that an EIS was not necessary.

■

In *WED III,* the supreme court stated that, when reviewing a negative declaration, the test is whether the decision not to prepare an EIS was reasonable under the circumstances. *WED III,* 79 Wis. 2d at 423, 256 N.W.2d at 157. The court stated:

> [T]he question whether there is present in a given case a major action significantly affecting the environment will in general be a matter of both law and fact. Moreover, there may be cases under WEPA when some degree of deference to agency expertise is appropriate—provided the agency is shown to possess such expertise and to have applied it in good faith.

*Id.*

To the extent that we review factual determinations made by the department, sec. 227.57(6), Stats., governs. This section provides:

> If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.

To the extent that we review matters of law determined by the department, sec. 227.57(5), Stats., governs. This section provides:

> The court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law.

*See City of La Crosse Police & Fire Comm. v. LIRC,* 139 Wis. 2d 740, 753–54, 407 N.W.2d 510, 515 (1987).[2]

In *WED III,* the supreme court concluded that the questions by which the agency decision is to be tested are:

> First, has the agency developed a reviewable record reflecting a preliminary factual investiga-

---

[2]*City of La Crosse Police & Fire Comm. v. LIRC,* 139 Wis. 2d 740, 407 N.W.2d 510 (1987), cites to sec. 227.20(5) and (6), Stats. (1983–84). These subsections are now contained in sec. 227.57, Stats. (1985–86).

tion covering the relevant areas of environmental concern in sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences of the action proposed; second, giving due regard to the agency's expertise where it appears actually to have been applied, does the agency's determination that the action is not a major action significantly affecting the quality of the human environment follow from the results of the agency's investigation in a manner consistent with the exercise of reasonable judgment by an agency committed to compliance with WEPA's obligations?

*WED III,* 79 Wis. 2d at 424–25, 256 N.W.2d at 158. (Footnote omitted.)

The Wisconsin Administrative Code, sec. **NR 150.04**(6), sets forth the requirements for an EA in a Type II action. This section provides:

(6) Unless the department otherwise determines to prepare an EIS, in determining whether a Type II action is major and whether or not the action will significantly affect the quality of the human environment, the department shall base its decision on an EA which shall contain the following information:

(a) A brief description of the proposed action including a description of proposed prevention and mitigating measures, maps, graphs and other material where appropriate.

(b) A brief description of those factors in the human environment most directly affected by the proposed action.

(c) A brief evaluation of the most significant primary and secondary environmental effects, including socioeconomic effects, that would result if the proposal is implemented.

(d) A brief evaluation of the project's impact on endangered and threatened species, fish and wildlife habitat, wetlands, scenic values, scientific and natural areas, energy use, and air and water quality when affected.

(e) A brief study, development and description of reasonable alternatives to the proposed action and a brief evaluation of the significant environmental effects that are different than the anticipated impacts of the proposed action.

(f) A listing of other agencies or groups contacted and the comments of, and other pertinent information from, the agencies and groups.

(g) An evaluation section which contains brief discussions of the specific factors in this paragraph. If the proposed action will lead to any of these results, the need to prepare an EIS is increased.

1. Stimulation of secondary (indirect) effects.

2. Creation of a new environmental effect.

3. Impacts on geographically scarce environmental features.

4. Precedent-setting nature of the action.

5. Significant controversy associated with the action.

6. Conflicts with official agency plans or local, state, or national policy.

7. Cumulative impacts of repeated actions of this type.

8. Foreclosure of future options.

9. Direct or indirect impacts on ethnic or cultural groups.

█

Before addressing the issue on its merits, we should first identify the materials which constitute the EA in this case. In 1983 the department prepared an EA in response to Freis' original proposal to place a

landfill on his property. Following Freis' submission of his revised proposal to the department in April 1984, the department in February 1985 prepared an Environmental Assessment Amendment. Since the 1985 report is designated as an "amendment," we conclude that both the 1983 and 1985 reports constitute the EA for purposes of this review.

In addition, both the 1983 EA and the 1985 EA Amendment contain "attachments." These documents generally consist of maps, departmental memoranda, and other correspondence relative to the proposed project. Although these "attachments" do not constitute the components of an EA mandated by Wis. Adm. Code, sec. **NR 150.04**(6), they do identify in some instances the underlying data and concerns. Therefore, we conclude that these "attachments" are also properly considered as part of the EA.

We now proceed to address aspects of the EA as we have defined it in this case. This analysis will be made in light of the requirements of Wis. Adm. Code, sec. **NR 150.04**(6).

We first consider concerns raised with respect to wetlands adjacent to the landfill site. Wisconsin Administrative Code, sec. **NR 1.95**(5), provides:

(a) *Department regulatory actions.* The department shall consider proposals which require its approval with the presumption that wetlands are not to be adversely impacted or destroyed and that the least overall adverse environmental impact shall result. Therefore, the department shall give primary consideration to reasonable alternatives, including the alternative of *denying the requested approval,* that avoid adverse impacts on wetlands and that result in the least overall adverse environmental impact. When all reasonable alterna-

249

tives necessarily result in adverse impacts on wetlands, the proposed activity shall be conducted in a manner which minimizes the loss of wetlands and the loss of functions which those wetlands may serve with respect to related wetlands and other waters of the state both in and outside the proposed àrea of use, and which results in the least overall adverse environmental impact. Where consistent with its existing authority, the department shall require that sponsors of actions affecting wetlands *convincingly demonstrate* that their proposals:

1. Need to be located in or adjacent to the wetland(s) in question.

2. Are technically, economically and environmentally feasible, and

3. Meet other applicable criteria as provided by law. [Emphasis added.]

In addressing the landfill's potential effect on the off-site wetland areas, the 1983 EA recited:

The proposed site has the capacity to affect the off-site wetland areas in the north and south as well as Fischer Creek. However, proper engineering and operation of the site *should* avoid impacts to these areas. The forested wetland in the south appears to be caused by a perched water table condition and may dry out seasonally. It is *unlikely* that site excavation or operation would affect this area. The perimeter ditch system should prevent surface run off onto the southern wetland. [Emphasis added.]

In addition, the 1985 EA Amendment recites:

Engineering of the proposed landfill, surface water flow controls, sedimentation basins and the location of the northern wetland *should* all mitigate

against contaminants or excess sediment reaching Fischer Creek. [Emphasis added.]

These unspecified hypothetical engineering and operational techniques are, in our judgment, insufficient to demonstrate that the department has developed a reviewable record of sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences of the proposed action. *WED III,* 79 Wis. 2d at 425, 256 N.W.2d at 158. The department's treatment of this consideration consists of a statement of the potential environmental danger, followed by an observation that technological ability exists to address it. This approach "leap-frogs" over any analysis of the potential problem or the solution. Moreover, it appears the department is trivializing its own regulations regarding the protection of wetlands.[3] We, as a reviewing court, are left to speculate as to what investigation permitted the department to reach this conclusion. In short, it does not appear to us that the department's expertise has actually been applied. *Id.*

Given the future problems that can arise with respect to landfills, especially when located adjacent to wetlands, *see Holtz & Krause, Inc. v. DNR,* 85 Wis. 2d 198, 270 N.W.2d 409 (1978), the department failed

---

[3]Wisconsin Administrative Code, sec. **NR** 1.95(3)(a), provides:

The presence of wetlands signifies physical characteristics which are limiting factors in the human activities which may occur in and adjacent to them. What may be limitations for one use of a wetland may also be the principal value supporting a different use. The state's policy as articulated in its trusteeship of navigable waters and the statutes enacted to further the protection and enhancement of the quality of its waters, creates a presumption against activities which adversely affect those wetlands under department jurisdiction or control.

to make an adequate factual investigation necessary to permit a reasonably informed preliminary judgment of the environmental consequences of the proposed landfill.

Another concern lies with the basic design of the Freis landfill. Questions were raised whether the design of the sedimentation ponds would be adequate. Fischer Creek which runs through the Freis property is adjacent to the landfill site and is part of the Seven Mile-Silver Creek Watershed, a priority watershed basin. A proposed soil borrow area is only 400 feet from Fischer Creek.

Concern was expressed about the lack of provisions for erosion and sediment control and for monitoring phosphorous and suspended solids in the water flowing from the sediment ponds into Fischer Creek. According to the United States Department of Agriculture Soil Conservation Service, such monitoring is necessary to ensure that the sediment ponds are working as designed and that the quality of Fischer Creek will not be degraded.

The 1983 EA observes:

> The sedimentation ponds would act as a holding basin for surface water run-off. Soil particles eroding off the site would settle out in the ponds, allowing clarified water to discharge to the northern wetland. Therefore, uncontrolled sedimentation should not occur in the wetland.

The 1985 EA Amendment observes:

> The water discharging to Fischer Creek from the northern wetland after the proposed site is constructed should have suspended sediment concentrations no higher than that presently discharged, and, with *proper water management,* sediment

concentrations should generally be lower. If the soil borrow area is utilized, strict *erosion and sediment control measures* would be required. At the closest point, the borrow area is approximately 400 feet from Fischer Creek. Without erosion control, sediment could readily be delivered to the creek. [Emphasis added.]

Here again, the EA leaps from premise to conclusion. Absent is any analysis as to what "proper water management techniques" and "erosion and sediment control measures" are required and necessary to avoid the deliverance of sediment to Fischer Creek. This shortcoming reveals a record of insufficient depth to permit a reasonably informed preliminary judgment as to the environmental consequences of the proposed action. *WED III,* 79 Wis. 2d at 425, 256 N.W.2d at 158. As such, a reasonably informed preliminary judgment as to this aspect of the environmental consequences of the proposed landfill cannot be said to have been made.

Another concern is the use to which the landfill site will be put once the site's useful life is complete. The Freis site is zoned exclusively agricultural. Following closure of the site, a return to farming is proposed. However, the 1983 EA observed that "[a]fter site closure, the site may not be able to return to unrestricted agricultural use. ... There may be limitations on returning the land to unrestricted agricultural use after closure." Attachment "C" to the 1985 EA Amendment includes a "Review of the Erosion Control Plan for the Feasibility Study on the proposed Freis Landfill in the Town of Centerville." This report was provided to the Manitowoc County Land Conservation Committee by the United States Department of Agriculture Soil Conservation Service and indicates

that the proposed slopes on the site do not lend themselves to future cultivation. The report indicates that any farming operations where tillage would be performed would create an erosion problem.

Thus, both the 1983 EA and the 1985 EA Amendment voice concern as to this potential negative environmental impact. Yet, neither document recites what steps are required to control or minimize the likely erosion problem following closure. This omission is more glaring than those previously noted, for here the problem, acknowledged by the EA itself, is not even addressed in terms of solution.

Departmental silence in this regard in the EA is unacceptable, particularly where this concern is voiced not only by the citizenry but also by departmental personnel. The result is a record of insufficient depth to permit a reasonably informed preliminary judgment as to the environmental and socioeconomic consequences of the proposed action. *Id.*

Concern was also expressed for the structural integrity of the Lutze Housebarn which was entered into the Library of Congress' Register of Historical Places. This structure is located near the proposed landfill site. Edith Lutze, the owner of the housebarn and one of the respondents in this action, questioned how vibrations from large trucks passing within 120 feet of the housebarn would affect the foundation of the structure. She was also concerned about the noise, smell and debris from the passing trucks.

The department appears to have referred the matter to the State Historical Society, which responded by observing that the landfill site was almost a mile cross-country from the housebarn and may not even be visible from the landfill site. Gratuitously assuming that the letter from the State Historical Society

constitutes the position of the department on this question, the answer is clearly unresponsive to Ms. Lutze's concerns and reflects a basic misunderstanding of her inquiry. Social effects of the proposal are to be addressed in an EA. *See* Wis. Adm. Code, sec. **NR 150.04(6)(c)**.[4] Again, this deficiency creates a record of insufficient depth on this point to permit a reasonably informed preliminary judgment as to the consequences of the proposed action on this historical structure. *WED III,* 79 Wis. 2d at 425, 256 N.W.2d at 158.

In summary, we conclude, even according to the department that degree of deference to which it is entitled, that the record in this case is insufficient to show a preliminary factual investigation of sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences of the proposed action. *Id.*

Our conclusion in this regard largely governs the resolution of whether the second prong of the *WED III* test has been satisfied. Again, this test inquires:

> [G]iving due regard to the agency's expertise where it appears actually to have been applied, does the

---

[4]The department also gives little attention to other aspects of the socioeconomic effects of the proposed landfill. Placing a landfill in an area that is exclusively agricultural and has been farmed for several generations will affect the people living in the area. Nearly 1000 people wrote to the department to register their concerns at the prospect of placing a landfill in their neighborhood. Significant controversy associated with the action increases the need to prepare an EIS. *See* Wis. Adm. Code, sec. **NR 150.04(6)(g)5.** Yet, the department's response was merely to mention a change in traffic patterns and an increase in dust and noise.

agency's determination that the action is not a major action significantly affecting the quality of the human environment follow from the results of the agency's investigation in a manner consistent with the exercise of reasonable judgment by an agency committed to compliance with WEPA's obligations?

*Id.*

██

Given the insufficiency of the investigation, we also conclude that demonstration of the agency's expertise has not been shown to have been applied in this case. As a result, the department's ultimate conclusion that the proposed Freis landfill is not a major action significantly affecting the quality of the human environment does not represent an exercise of reasonable judgment in light of the requirements of WEPA.

We therefore affirm the judgment of the circuit court.[5]

*By the Court.*—Judgment affirmed.

---

[5]We have considered whether a remand for preparation of an EIS as ordered by the trial court is appropriate or whether a remand for purposes of the department correcting the deficiencies we have noted in the instant EA should first be performed. We note, however, that specific issue is not taken with the remand aspects of the circuit court's judgment on this appeal. Therefore, our affirmance runs to the total judgment.