(90–CV–1681) STATE EX REL. Janet BOEHM, Dan Fischer, Joseph A. Lentz, Hildegarde Lesjak, Verner Lund, Wally A. Machulak, Virginia Schultz, Ruth White and Waste Management of Wisconsin, Inc., Petitioners-Appellants-Petitioners,

v.

Wisconsin DEPARTMENT OF NATURAL RESOURCES, Wisconsin Department of Administration Division of Hearings & Appeals and Patrick T. Currie, Respondents-Respondents,

EMERALD PARK, INC., Interested Party-Respondent.

(90–CV–1834) CITY OF MUSKEGO, a municipal corporation, Petitioner,

v.

Wisconsin DEPARTMENT OF NATURAL RESOURCES, Wisconsin Department of Administration Division of Hearings & Appeals and Patrick T. Currie, Respondents,

EMERALD PARK, INC., Interested Party.

Supreme Court

*No. 90-2691. Oral argument November 30, 1992.—Decided March 24, 1993.*

(Also reported in — N.W.2d —.)

*See Callaghan's Wisconsin Digest, same topic and section number.

For the petitioners-appellants-petitioners there were briefs by *William B. Guis, William S. Roush, Jr.,*

*Caren B. Goldberg* and *Friebert, Finerty & St. John, S.C.,* Milwaukee and oral argument by *Mr. Roush.*

For the respondents-respondents the cause was argued by *Joanne F. Kloppenburg,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

For the interested party-respondent there was a brief by *Michael P. Dunn* and *Davis & Kuelthau, S.C.,* Milwaukee and oral argument by *Mr. Dunn.*

JON P. WILCOX, J. This is a review under sec. (Rule) 809.62, Stats., of an unpublished court of appeals decision affirming Waukesha County Circuit Court Judge Willis J. Zick's order upholding the conclusion of the Department of Natural Resources (DNR) that an environmental impact statement (EIS) was not required with respect to a landfill proposed by Emerald Park, Inc. to be located in Muskego, Waukesha County, Wisconsin.

Petitioners challenge the adequacy of the record developed by the DNR and its conclusion that an EIS was not necessary. The petitioners also contend that the trial court erred by refusing to supplement the administrative record with the deposition of Ken Wade. We conclude that the record prepared by the DNR was adequate and its decision not to prepare an EIS was reasonable. We further conclude that the trial court did not erroneously exercise its discretion in refusing to add the Wade deposition to the administrative record because leave was not granted by the court to take such testimony. We affirm.

Pursuant to sec. 144.44, Stats., Emerald Park submitted a feasibility report for the proposed landfill in August 1988. The initial feasibility report was supplemented by four addenda at the DNR's request. The

DNR determined that the feasibility report was complete on November 30, 1989. Simultaneously, the DNR issued a draft environmental assessment in which it concluded that an EIS was not required under Wisconsin's Environmental Policy Act (WEPA) sec. 1.11, Stats.,[1] because the proposed landfill would not significantly affect the quality of the human environment.

On March 19, 1990, a public informational meeting was held concerning the draft environmental assessment. At the public meeting the petitioners urged the DNR to prepare an EIS. The petitioners submitted information suggesting that wetlands may be affected by the proposed site. The DNR concurred following a site visit and required Emerald Park to provide additional information concerning the wetlands. After reviewing Emerald Park's Wetland Analysis, which identified approximately two acres of wetlands on the proposed

---

[1] Section 1.11(2), Stats., provides:

**(2)** All agencies of the state shall:

(c) Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the human environment, a detailed statement, substantially following the guidelines issued by the United States council on environmental quality under P.L. 91–190, 42 U.S.C. 4331, by the responsible official on:

1. The environmental impact of the proposed action;

2. Any adverse environmental effects which cannot be avoided should the proposal be implemented;

3. Alternatives to the proposed action;

4. The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

5. Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

6. Such statement shall also contain details of the beneficial aspects of the proposed project, both short term and long term, and the economic advantages and disadvantages of the proposal.

site, the DNR concluded that the loss of wetlands would be minimal in nature.

The DNR issued a Certified Environmental Analysis on July 2, 1990. With a contested case hearing regarding the feasibility of the proposed landfill scheduled to begin on July 9, 1990, the petitioners filed a petition for review of the Certified Environmental Analysis and sought a preliminary injunction to stop the contested case hearing from going forward. The court found there was a substantial certainty that the petitioners would prevail regarding the inadequacy of the Certified Environmental Analysis and preliminarily enjoined the contested case hearing.

The DNR voluntarily chose to prepare a new environmental analysis which further addressed the wetland impact of the proposal. The petitioners filed extensive comments and supporting documentation on August 2, 1990. The DNR issued a revised environmental analysis on August 16, 1990. The revised environmental analysis addressed the wetland impact in more detail and found that the wetland impact would be minimal and that the nearby wetlands proposed to be enhanced would exceed the value of those wetlands eliminated. The revised environmental analysis concluded that an EIS was not necessary.

The circuit court conducted hearings on the adequacy of the revised environmental analysis and concluded that it was inadequate. The circuit court remanded the case to the DNR for further review of wetland and flooding impacts.

On November 16, 1990, the DNR issued a supplemental environmental analysis which addressed the concerns of the circuit court. The supplemental environmental analysis concluded that an EIS was not necessary. The circuit court concluded that the DNR's

environmental analysis as supplemented complied with the court's earlier remand and satisfied the requirements of WEPA. The court of appeals affirmed the circuit court's decision. We granted the petition for review.

The purpose of WEPA is to insure that agencies consider environmental impacts during decision making. *Wisconsin's Environmental Decade, Inc. v. Public Service Commission,* 79 Wis. 2d 409, 416, 256 N.W.2d 149 (1977) *(WED III); City of New Richmond v. Wisconsin Dept. of Natural Resources,* 145 Wis. 2d 535, 542, 428 N.W.2d 279 (Ct. App. 1988). WEPA is procedural in nature and does not control agency decision making. Rather, it requires that agencies consider and evaluate the environmental consequences of alternatives available to them and undertake that consideration in the framework provided by sec. 1.11, Stats. *WED III,* 79 Wis. 2d at 416; *New Richmond,* 145 Wis. 2d at 542.

WEPA requires that all state agencies prepare an EIS for "every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the human environment . . .." Section 1.11(2)(c), Stats. Thus, only if it is a major action significantly affecting the quality of the human environment is an EIS to be conducted. *Wisconsin's Environmental Decade, Inc. v. Wisconsin Dept. of Natural Resources,* 115 Wis. 2d 381, 394, 340 N.W.2d 722 (1983). In the instant case, the DNR concluded that an EIS was not required because the landfill proposal was not a major action which would significantly affect the quality of the human environment.

We must first determine the appropriate standard of review for a negative EIS determination by a state

665

agency. The test as to whether an EIS should be conducted is one of reasonableness and good faith. *Wisconsin's Environmental Decade, Inc. v. Dept. of Industry, Labor & Human Relations,* 104 Wis. 2d 640, 644, 312 N.W.2d 749 (1981); *WED III,* 79 Wis. 2d at 423. The often repeated two-part test of this reasonableness and good faith standard is as follows:

> First, has the agency developed a reviewable record reflecting a preliminary factual investigation covering the relevant areas of environmental concern in sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences of the action proposed; second, giving due regard to the agency's expertise where it appears actually to have been applied, does the agency's determination that the action is not a major action significantly affecting the quality of the human environment follow from the results of the agency's investigation in a manner consistent with the exercise of reasonable judgment by an agency committed to compliance with WEPA's obligations?

*WED III,* 79 Wis. 2d at 425.[2]

Accordingly, we first review the adequacy of the record developed by the DNR. We examine the record to see whether the DNR considered relevant areas of environmental concern and whether the DNR conducted a preliminary factual investigation of sufficient depth to

---

[2] Other cases which have quoted and applied this two-part test include: *New Richmond,* 145 Wis. 2d at 542-43; *Town of Centerville v. Dept. of Natural Resources,* 142 Wis. 2d 240, 246-47, 417 N.W.2d 901 (Ct. App. 1987); *Wisconsin's Environmental Decade, Inc. v. Dept. of Natural Resources,* 115 Wis. 2d 381, 391, 340 N.W.2d 722 (1983); *Wisconsin's Environmental Decade, Inc. v. Dept. of Natural Resources,* 94 Wis. 2d 263, 268-69, 288 N.W.2d 168 (1979).

permit a reasonably informed preliminary judgment of the environmental consequences of the proposed action. *WED III,* 79 Wis. 2d at 425. We conclude that the record in this case reflects a sufficient preliminary investigation into the relevant areas of environmental concern to permit a reasonably informed preliminary judgment as to the environmental consequences of the proposed landfill. The record exceeds that which was envisioned by *WED III.*

■

The record produced by the agency need not follow any particular form. *WED III,* 79 Wis. 2d at 425 n.15. All it must do is "reveal in a form susceptible of meaningful evaluation by a court the nature and results of the agency's investigation and the reasoning and basis of its conclusion." *Id.* The record need not contain a primary document supporting each conclusion. The record in this case consists of well over 2,500 pages which includes a two-volume feasibility report with four addenda. The circuit court engaged in an extensive review of the factual record, considered petitioners several challenges in detail and twice remanded the case back to the DNR. In each instance, the DNR conducted further investigation into the specific environmental concerns raised by the circuit court and addressed those concerns in revised or supplemental environmental analyses. There was more than adequate documentation in the record reflecting a good faith investigation into each of the environmental concerns relevant to this project.

The petitioners assert that the DNR failed to evaluate the archaeological significance of the site. We disagree. The DNR required an archaeological survey as part of the feasibility report, evaluated the data in the environmental analysis, and required a full-scale archaeological investigation prior to licensing approval.

The Feasibility Report contains a detailed archaeological survey performed in May 1988 by archaeologist James R. Graves of the University of Wisconsin-Madison. The evaluation in the Feasibility Report states:

> The results of these test activities suggest that several sites may exist within the area under consideration. Several archaeological resource localities were discovered. Only three of these were located within the area which will be disturbed by landfill development. Of these three, two were isolated finds which indicates that further surveys are not recommended at those two sites. The third site of approximately 205 square feet, did not locate anything significant, such as pottery, which indicated the site was probably not permanent settlement. However, further study at that site may be appropriate. Therefore, RMT recommends Phase II testing, including a controlled surface collection and test pits (or trenches) to determine the site's extent and state of preservation below the plow zone. The State Historical Society is presently reviewing this recommendation. The Phase II testing will define the known archaeological resources located on the proposed Emerald Park, Inc., Landfill. After reviewing photographs and other site-specific information, the State of Wisconsin Historical Society concluded that the present on-site buildings were of no significant historical value.

For one site, the evaluation recommended further testing. The State Historical Society of Wisconsin concurred with the results of the archaeological survey. The August 14, 1990, environmental analysis states, "The archaeological significance of the proposed site is unknown. Some initial work was done several years ago and a few indications of pre-historical occupation were found. As part of the Department's condition of

approval, an archaeological survey recommended by the State Historical Society of Wisconsin would be required." As a consequence, the Proposed Conditions of Approval issued with the environmental analysis require that the plan of operation include an archaeological survey as recommended by the State Historical Society.

The record demonstrates that the potential archaeological impacts were identified, evaluated and determined not to be significant. The DNR required additional archaeological testing before the facility can be approved. The DNR performed a more than adequate preliminary investigation into the archaeological impact of the proposed landfill.

Petitioners argue that the DNR did not perform an adequate investigation into the wetland impact of the proposed landfill and that Wisconsin Administrative Code sec. NR 1.95 was not complied with. We disagree. Once the existence of wetlands was brought to the DNR's attention, a DNR staff specialist evaluated the wetlands and Emerald Park was required to submit a Wetland Analysis. The supplemental environmental analysis addressed the wetland impact in detail and indicates that the DNR did a more than adequate investigation into the wetland impact of the proposed landfill.

The detailed Wetland Analysis submitted by Emerald Park described and evaluated the quality of the wetlands on the proposed site and recommended restoration of eighteen acres of wetlands west of the site to offset the potential two-acre loss of wetlands on the site. The DNR's water management specialist concurred with this evaluation and recommendation. The DNR specialist concluded: "Those wetlands which will be lost . . . will be replaced elsewhere or compensated for through improvements in quality within adjacent wetland areas. The loss

of . . . wetlands is minimal in nature and the associated quality is limited."

Relying on the Wetland Analysis and the investigation of its own specialist, the DNR in its revised environmental analysis and supplement concluded that the wetland impact would be insignificant. This conclusion was based upon the assumption that in order to be licensed the site must be developed in accordance with Wisconsin Administrative Code chapters NR 500–520. Further, a mitigation plan including absorption of runoff and biofiltration basins were made part of the DNR's conditions of approval for the landfill.

The revised environmental analysis and supplement display a thorough investigation and evaluation of the wetland impact of the proposed site. The record reflects a more than adequate investigation to permit the DNR to reasonably conclude that the wetland impact would be insignificant.

The DNR's wetland investigation and analysis complies with Wisconsin Administrative Code sec. NR 1.95.[3] The wetland analysis and supplemental environ-

---

[3] Section 1.95(5), Wis. Admin. Code provides:

(5) GENERAL STANDARDS TO BE APPLIED IN DECISIONS AFFECTING WETLANDS. (a) *Department regulatory actions.* The department shall consider proposals which require its approval with the presumption that wetlands are not to be adversely impacted or destroyed and that the least overall adverse environmental impact shall result. Therefore, the department shall give primary consideration to reasonable alternatives, including the alternative of denying the requested approval, that avoid adverse impacts on wetlands and that result in the least overall adverse environmental impact. When all reasonable alternatives necessarily result in adverse impacts on wetlands, the proposed activity shall be conducted in a manner which minimizes the loss of wetlands and the loss of functions which those wetlands may serve with respect to related wetlands and other waters of the state both in and outside the proposed area of use, and which results in the least overall adverse environ-

mental analysis contain detailed descriptions of all wet-
lands affected, evaluation of the site's wetland values,
and impacts of the landfill on those wetlands with justi-
fication of why the landfill needs to be located in this
area. Alternatives were discussed and the plan adopted
was the one which would have the least overall impact
on wetlands. There is also a discussion regarding the
technical, economical and environmental feasibility of
this plan. All of this fulfills the requirements of NR 1.95.

Petitioners contend that the DNR's evaluation of
sedimentation impacts was conclusory. We disagree. The
Feasibility Report studied the impact of changes in sur-
face water drainage patterns, including increased dis-
charges of sediments due to increased surface water dis-
charge. Emerald Park proposed to construct a
sedimentation basin to "control rainfall run-off and limit
entrained sediment from reaching surface water bodies."
The DNR required a more detailed evaluation of the
anticipated increased run-off to the western wetland. In
response Emerald Park redesigned the sedimentation
basin.

The revised environmental analysis evaluated the
increased discharge of surface water and concluded that
the basins designed for this landfill would catch most of
the sediment from increased discharges. The DNR
required the plan of operation to include detailed plans
for the sedimentation basin through which all surface
water runoff must be routed. In addition the plan of

---

mental impact. Where consistent with its existing authority, the
department shall require that sponsors of actions affecting wetlands
convincingly demonstrate that their proposals:

 1. Need to be located in or adjacent to the wetland(s) in
question,

 2. Are technically, economically and environmentally feasible,
and

 3. Meet other applicable criteria as provided by law.

operation was required to include plans, specifications, and performance criteria for a biofilter to provide treatment of water discharging from the sedimentation basin.

The supplemental environmental analysis again discussed sedimentation and the biofilter requirement:

> Biofiltration is a fancy word for creating man-made wetlands. The Department knows some small amounts of fine sediments will pass through the sedimentation basin proposed by Emerald Park. Although insignificant, the Department reasons that the company has the resources and can hire the expertise to create a "biofilter" which will reduce even these small amounts. The Department has national expertise in this area and has a desire to encourage this sort of work. At Emerald Park, we have an opportunity to not only keep water quality discharge the same, but to actually improve it over what has occurred in the past.

The record indicates an adequate investigation into the sedimentation impacts of the proposed landfill to permit the DNR to reasonably conclude that the environmental impact would be insignificant.

Petitioners argue that the DNR's determination that the proposed site was not in a floodplain was conclusory and without basis in the record. We disagree. Wisconsin Administrative Code sec. NR 504.04(3)(c) prohibits the siting of a landfill within a floodplain. The DNR determined that the proposed landfill was not located within a floodplain after checking the Muskego area flood insurance maps. The record indicates a sufficient preliminary investigation to allow the DNR to reasonably conclude that the proposed landfill site was not within a floodplain.

We conclude that the DNR developed a reviewable record reflecting a preliminary factual investigation covering the relevant areas of environmental concern in sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences of the proposed landfill. The environmental analysis and supplement prepared by the DNR along with the over 2,500 pages of supporting engineering analyses and reports in the record reflect a comprehensive consideration of the relevant areas of environmental concern. The record reflects an in-depth investigation of all relevant areas of environmental concern that far exceeds the preliminary factual investigation mandated by *WED III.*

Petitioners assert that it was improper for the DNR to base its negative EIS determination on proposed conditions for approval of the landfill and the assumption that any environmental consequences will be controlled through compliance with applicable administrative code provisions. Petitioners argue that the issuance of a negative EIS decision in conjunction with proposed conditions for approval improperly postponed the DNR's responsibility to conduct a preliminary investigation into the environmental impacts of this project. We disagree.

Along with the revised environmental analysis of August 14, 1990 the DNR issued a document titled "Proposed Conditions Of Approval For The Emerald Park, Inc. Landfill Project." This document contained twenty-nine conditions for approval of the landfill which were designed to control the environmental consequences of the landfill. Some of the conditions included: an archaeological survey as recommended by the State Historical Society of Wisconsin, a biofiltration basin to pre-

vent adverse sedimentation or flooding impacts, and a wetland mitigation plan as described above.

The revised environmental analysis of August 14, 1990 stated:

> The most significant physical change resulting from the development of the site as a sanitary landfill would be the modification of the existing site topography and the alteration of the local surface water drainage patterns. However, these changes would not substantially affect the quality of the local environment if the proposed wetland mitigation is developed and the site is developed in accordance with the provisions of chapters NR 500–520, Wis. Adm. Code. These codes govern development of landfills and are enforceable by the Department. The mitigation plan, including absorption of run-off and biofiltration basins, are in the Department's "Proposed Conditions of Approval" for Emerald Park Landfill.

The supplemental environmental analysis of November 16, 1990 explained:

> It became clear to the Department that modifications of topography and alteration of drainage, although the most important change and impacts, would be insignificant as long as Department standards found in NR 500 through 520, Wis. Adm. Codes were followed. . . .

> The wetland mitigation . . . provides further assurance that the high quality wetlands will be restored and preserved, not only maintained in their present status. . . . Through the encouragement of the Department, Emerald Park voluntarily developed plans for improvements to wetlands west of the site. The Departments proposed conditions of approval ensure a viable wetland restoration planning area is

included and give the plan force of law through the approval process. . . .

In summary, to be licensed the project *must* comply with applicable administrative code provisions. If the project were to violate the Administrative Codes the project could then become environmentally significant, but this would be contrary to law and the Department would halt the project and demand repair. Alternatively, if the project were to fail to implement the various wetland and water quality mitigation plans, it would be a less desirable project but the environmental impacts would still be insignificant.

Many federal cases have upheld environmental assessments and Findings of No Significant Impact (FONSIs) that incorporate conditions for approval or mitigation measures.[4] *C.A.R.E. NOW, Inc. v. F.A.A.,* 844 F.2d 1569, 1575 (11th Cir. 1988) (FONSI upheld where mitigation measures imposed as conditions precedent to approval); *Oklahoma Wildlife Federation v. United States Army Corps of Engineers,* 681 F. Supp. 1470, 1489 (N.D. Okla. 1988) (FONSI in conjunction with mitigating conditions was not a postponement of the agency's responsibility to consider environmental consequences, as appropriate mitigating conditions eliminated need for EIS); *Van Abbema v. Fornell,* 807 F.2d 633, 637 (7th Cir. 1986) (negative EIS decision upheld where special conditions imposed on resulting permit indicate that the agency took a detailed and critical look at environ-

[4] WEPA was patterned after sec. 102 of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. sec. 4332. Federal law construing NEPA is persuasive authority with respect to the interpretation of WEPA. *Wisconsin's Environmental Decade, Inc. v. Public Service Commission,* 79 Wis. 2d 161, 174, 255 N.W.2d 917 (1977) *(WED II).*

mental impact); *Friends of the Earth v. Hintz*, 800 F.2d 822, 836–38 (9th Cir. 1986) (agency entitled to consider on-site and off-site mitigation plans in determining whether permit authorizing discharge into wetlands area required EIS); *State of Louisiana v. Lee*, 758 F.2d 1081, 1083 (5th Cir. 1985) (permit conditions that are legally enforceable by the agency preparing the environmental analysis must be considered in reviewing no significant impact determination); *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 682–83 (D.C. Cir. 1982) (no EIS required where project was modified prior to implementation by adding specific mitigation measures that completely compensated for any adverse environmental impacts).

■ WEPA requires an EIS only when a proposed action will significantly affect the quality of the human environment. If the proposal is modified prior to implementation by adding conditions for approval which compensate for any possible adverse environmental impacts stemming from the original proposal, the statutory threshold of significant environmental effects is not crossed and an EIS is not required. *Cabinet Mountains Wilderness*, 685 F.2d at 682. To require an EIS in such circumstances would trivialize WEPA and diminish its utility in providing useful environmental analysis for major actions that truly affect the environment. *Id.*

■ We conclude that an agency may control potential adverse environmental consequences through conditions that must be complied with to obtain approval. *See New Richmond*, 145 Wis. 2d at 550. Further, an agency may assume that any environmental consequences will be controlled through compliance with the applicable administrative code provisions.

Because we conclude that the DNR satisfied the first part of the test articulated in *WED III*, we next address the DNR's determination that the proposed landfill is not a major action significantly affecting the quality of the human environment. The question we must consider is whether this determination follows from the results of the DNR's investigation in a manner consistent with the exercise of reasonable judgment. *New Richmond,* 145 Wis. 2d at 548. We conclude that the DNR's decision not to prepare an EIS was reasonable based on the record.

In determining the reasonableness of the DNR's decision that an EIS is not required, we defer to the technical expertise of the department. *Id.* This is particularly appropriate in this case because the DNR is the state agency possessing staff, resources, and expertise in environmental matters. *Id.* The courts are ill-equipped to determine the affects of a proposed project on the environment. The court in *New Richmond* stated:

> It is possible that any change in our environment may be viewed as a "major action" by the public. Nonetheless, the language in WEPA sec. 1.11 maintains a distinction between major actions requiring an EIS and non-major matters that do not. We must rely on the department for its expertise in making such technical scientific determinations as long as it acts reasonably based on an adequately developed record.

*New Richmond,* 145 Wis. 2d at 548.

In its revised environmental analysis and supplement the DNR considered the landfill's adverse environmental effects, reviewed alternatives, and evaluated the need for an EIS. After analyzing the anticipated effects

of the landfill on the environment, it determined that an EIS was not necessary because the landfill was not a major action that would significantly affect the quality of the human environment.

The DNR applied its expertise throughout its consideration of the need for an EIS. The DNR addressed in detail each of the concerns raised by the petitioners. It cited particular data found in the record to support its negative EIS determination. The DNR applied its expertise by designing conditions for approval which will control any potential adverse environmental consequences. The DNR identified the environmental issues related to the proposed landfill, considered their effects, and reasonable alternatives. Nothing more is required of the DNR. The DNR's determination not to prepare an EIS was reasonable based upon the record.

We next turn to the petitioners argument that the trial court erred in refusing to add the November 19, 1990 deposition of Ken Wade to the administrative record. Section 227.57(1), Stats., provides that administrative review:

> shall be conducted by the court without a jury and shall be confined to the record, except that in cases of alleged irregularities in procedure before the agency, testimony thereon may be taken in the court and, if leave is granted to take such testimony, depositions and written interrogatories may be taken prior to the date set for hearing . . ..

The plain language of the statute makes clear that depositions may be taken for purposes of sec. 227.57(1), Stats., only if leave is first granted to take testimony in court. No such leave was granted in this case. We con-

clude that the trial court did not erroneously exercise its discretion in refusing to supplement the administrative record with the Wade deposition.

In summary, we conclude that the DNR developed an extensive record reflecting a preliminary factual investigation into the relevant areas of environmental concern of the proposed landfill. The DNR's decision not to prepare an EIS was reasonable based on the record. The test of *WED III* was not only met but passed beyond any doubt. Finally, the trial court did not erroneously exercise its discretion in refusing to supplement the administrative record with a deposition which was taken without first obtaining a grant of leave from the court to take such testimony.

*By the Court.*—The decision of the court of appeals is affirmed.